```
              DISTRICT COURT OF THE VIRGIN ISLANDS
              DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA         )
                                 )
               Plaintiff         )
                                 )
          v.                     )     Criminal No. 2010-36
                                 )
ENID EDWARDS,                    )
FRANCIS BROOKS, and              )
BILL JOHN-BAPTISTE,              )
                                 )
               Defendants.       )
```

**ATTORNEYS:**

**Kim Lindquist, Esq.**
United States Attorney's Office
St. Thomas, VI
        *For the plaintiff,*

**Jay I. Shreenath, Esq.**
Shreenath & Association
Austell, GA
**John-Russell Bart Pate**
J.R. Pate, PC
St. Thomas, VI
        *For defendant Enid Edwards,*

**George H. Hodge, Jr., Esq.**
Law Offices of George H. Hodge, Jr.
St. Thomas, VI
        *For defendant Francis Brooks,*

**Robert L. King, Esq.**
Law Offices of Robert L. King
St. Thomas, VI
        *For defendant Bill John-Baptiste.*

## <u>MEMORANDUM OPINION</u>

Before the Court are various post-trial motions of

defendants Enid Edwards ("Edwards"), Francis Brooks ("Brooks"),

and Bill John-Baptiste ("John-Baptiste") (jointly, the

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 2

"defendants"). The defendants move for judgments of acquittal

pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"),

and for new trials, pursuant to Federal Rule of Criminal

Procedure 33 ("Rule 33").

## I.    **FACTS**

On June 24, 2010, the Grand Jury returned an indictment

against the defendants. On September 2, 2010, the Grand Jury

returned a fifty-four count superseding indictment against the

defendants.

The trial of this matter commenced on January 3, 2011. The

government rested on January 7, 2011. The defendants presented

their cases until January 11, 2011, after which the Government

presented a rebuttal witness.

The jury commenced deliberations on January 12, 2011. On

January 14, 2011, the jury returned verdicts finding Edwards

guilty of twenty-two counts, Brooks guilty of twenty-five

counts, and John-Baptiste guilty of one count.

## II.    **DISCUSSION**

**A.    Rule 29**

A defendant "challenging the sufficiency of the evidence

bears a heavy burden." *United States v. Casper*, 956 F.2d 416,

421 (3d Cir. 1992). A judgment of acquittal is appropriate under

Rule 29 only if, after reviewing the record in a light most

favorable to the prosecution, the Court determines that no

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 3

rational jury could find proof of guilt beyond a reasonable doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (holding that a district court must " 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.' " (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

An insufficiency finding should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted); *see also United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984) ("Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible."). The government may sustain its burden entirely through circumstantial evidence. *Bobb*, 471 F.3d at 494; *see also United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988).

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 4

**B.    Rule 33**

When deciding a Rule 33 motion for a new trial, the Court is provided somewhat more discretion than what is afforded under Rule 29. Under Rule 33, the Court may grant a new trial "in the interest of justice." *United States v. Charles*, 949 F. Supp. 365, 368, 35 V.I. 306 (D.V.I. 1996). In assessing such "interest", the court may weigh the evidence and credibility of witnesses. *United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990), *aff'd*, 914 F.2d 244 (3d Cir. 1990). If the Court determines that there has been a miscarriage of justice, the court may order a new trial. *Id*. "The burden is on the defendant to show that a new trial ought to be granted. Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Clovis*, Crim. No. 94-11, 1996 U.S. Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

## III. <u>ANALYSIS</u>

**A.    Rule 29**

**1.    Count One--RICO Conspiracy**

In Count One, the jury found Edwards and Brooks guilty of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title Eighteen, Section 1962(d) of the United States Code. To sustain its burden of proof on a RICO conspiracy charge, the government must show: (1) that two or

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 5

more persons agreed to conduct or to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity; (2) that the defendant was a party to or member of that agreement; and (3) that the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity and intending to join together with at least one other alleged conspirator to achieve that objective. *United States v. Riccobene,* 709 F.2d 214, 224 (3d Cir. 1983).

The essence of any conspiracy is the agreement. *United States v. Pressler,* 256 F.3d 144, 147 (3d Cir. 2001). Because agreements to commit crimes are clandestine by nature, direct evidence of criminal conspiracies is rare. *See id.* "The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988). "Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred." *United States v. Idowu*, 157 F.3d 265, 266-67 (3d Cir. 1998) (citation and quotations omitted). For example, a rational jury may find a conspiracy where the alleged co-conspirators: demonstrated a

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 6

level of mutual trust, referred business to one another in exchange for discounts, frequently met to exchange large sums of money, consulted each other about drug prices, conducted their business in code, stood on lookout for each other, provided protection to one another, shared packaging materials, shared profits, or acted as debtor or creditor to one another. *See Pressler,* 256 F.3d at 153-54; *United States v. Gibbs*, 190 F.3d 188, 200-02 (3d Cir. 1999); *United States v. Powell,* 113 F.3d 464, 467 (3d Cir. 1997); *United States v. McGlory,* 968 F.2d 309, 322-28 (3d Cir. 1992).

To establish a pattern of racketeering activity, the Government must show that there was " 'continuity plus relationship' among the predicate acts." *United States v. Mark*, No. 10-4075, 2012 WL 120092, at *3 (3d Cir. Jan. 17, 2012) (quoting *Sedima S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985) (quoting S. REP. NO. 91-617, at 158 (1969))). Racketeering acts are "related" if the acts had the same or similar purposes, results, participants, victims or methods of commission, or were otherwise interrelated by distinguishing characteristics. *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987). "[S]poradic and separate criminal activities alone cannot give rise to a pattern for RICO purposes . . . ." *Mark*, 2012 WL 120092, at *3 (quoting *United States v. Eufrasio*, 935 F.2d 553, 565 (3d Cir. 1991). However,

United States v. Edwards
Criminal No. 2010-36
Order
Page 7

"in organized crime cases, relatedness and continuity may be

established 'by connecting diverse predicate acts to an

enterprise "whose business is racketeering activity." ' " *Id.*

(quoting *United States v. Basciano*, 599 F.3d 184, 202 (3d Cir.

2010) (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383

(3d Cir. 1989))).

Courts have recognized that "a criminal enterprise is more,

not less, dangerous if it is versatile . . . ." *United States v.*

*Eufrasio*, 935 F.2d 553, 566 (3d Cir. 1991) (internal citation

omitted). Accordingly, "RICO tolerates the possibility that the

predicate acts themselves may be diverse." *Mark*, 2012 WL 120092,

at *3 (citing *United States v. Bergin*, 650 F.3d 257, 270-71 (3d

Cir. 2011)). Viewing the evidence in the light most favorable to

the government, the Court must determine whether any rational

jury could find beyond a reasonable doubt that the elements of a

conspiracy have been satisfied with respect to the defendants.

In support of these charges, the Government relies on the

testimony of Kelvin Moses ("Moses"). Moses testified that from

2000 to 2003 and from 2005 to 2007, he paid money to Edwards and

Brooks "for information in regards [*sic*] to people who were

cooperating with them and when the federal--new federal officers

came into the territory."(Tr. Day 3 at 183:4-11.) Moses further

testified that in August, 2005, Edwards and Brooks forced him to

purchase six pounds of marijuana from them. (Tr. Day 3 at 185:5-

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 8

188:19.) Moses explained that most of his interactions with

Edwards and Brooks involved both of the officers:

> A. Yes, I had quite a bit of interaction with Officer
> Edwards and Officer Brooks.
>
> Q. Was this separate interactions or was this, were
> they together?
>
> A. Most of the actions were together.
>
> Q. Describe the nature of those interactions.
>
> A. Well, between those years, I--actually, I call it
> being extorted, I was extorted by Officer Edwards and
> Officer Brooks.

(Tr. Day 3 at 176:14-22.)

The Government also relies on the testimony of John

Lindquist ("Lindquist"). He testified that in the summer of

2009, Edwards and Brooks forced Lindquist to purchase $3,500 of

rock cocaine from them. (Tr. Day 4 at 18:10-22:25.)

The Government also relies on the testimony of Elias Deeb

("Deeb"). Deeb testified that Edwards and Brooks frequently

demanded payments of money from him. Among other things, Deeb

testified that Edwards accepted $500 from Deeb in exchange for

providing him with a Virgin Islands driver's license. During

this transaction, he indicated that Brooks acted as a contact

person for Edwards. In completing that transaction, Deeb

testified:

> A. I put the $500 and the copy [of my diver's license]
> in the envelope, and I give to Officer Brooks. . . .

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 9

Q. So how much money did you initially offer Officer Edwards?

A. I gave her the first, when she, when she show me the driver [*sic*] license, 300. And I went to my van again, I bring the other hundred; 400.

Q. Who was driving the vehicle, the police vehicle that we saw there?

A. Officer Brooks.

Q. And who was in the passenger seat?

A. Officer Edward.

. . . .

Q. What just happened when she said, "Hold out your hand"?

A. Give me a driver license.

Q. How did she give you the driver's license? Describe how she gave it to you.

A. Like this (indicating). She put, like open--I opened my hand, and she drop it inside my hand. She wasn't--in like, piece of paper. She got paper and she drop it in my hand.

(Tr. Day 2 at 261:4-273:6.)

Deeb also testified that Brooks and Edwards cooperated to obtain a driver's license for him. Deeb testified, for example, that on December 30, 2008, he called Brooks to see if Edwards had procured a driver's license. (Tr. Day 2 at 265:25-266:3.) He further testified that Edwards instructed him to provide her payment to Brooks. (Tr. Day 2 at 259:20-24.) Moses and Deeb also testified that Brooks acted in concert with Edwards.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 10

The Government offered additional testimony from Lindquist that Brooks twice demanded a money payment in exchange for not arresting Lindquist for possession of an unlicensed firearm. At the first of these incidents, which occurred in late January or early February of 2009, Edwards was not present. At trial, Lindquist testified about that incident:

> A. . . . . And I had a gun in my waist. And I was sitting down, and he seen the butt. And he reached down and he grabbed it.
>
> He asked me, "What's this?"
>
> And I tell him, "Oh God, can you give me a break?"
>
> And he tell me, "We going work something out." He tell me, "I know where to find you."
>
> And I took off walking--he tell me "Go." I took off walking over the hill and I left. And then I look back, I just look back just to make sure if this was happening for real, and then I left.
>
> And about a week, week later or so, he came in Contant, next to Asylum Bar, where I be out on the spot hanging out. He pull up. He say, "You got money for me"?
>
> I tell him, "I ain't got all, but"--
>
> Q. Let me ask you this. You said "money." Did you all discuss an amount the first time he talked to you?
>
> A. He told me he want $2,000.
>
> Q. What was he wearing when this happened?
>
> A. When I look back, he, all he was wearing is a T-shirt, a police T-shirt.
>
> Q. So did you have any money for him?

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 11

A. I had to give him $2,000.

Q. Did you do that?

A. Yes.

(Tr. Day 4 at 16:2-17:3.)

Approximately four to five months later, Edwards was present with Brooks when Brooks again discovered that Lindquist was carrying an unlicensed firearm. This incident late at night at a club on St. Thomas known as "Club 75." Lindquist testified:

A. . . . . And when [Brooks] felt the gun, he pulled the gun out. He ain't even--he grabbed it and he looked 'round. He said, "I catch a fish. I catch a fish."

I like, "Oh God, give me a break."

[Brooks] tell Enid [Edwards], "I got a fish. I got a fish." He say, "Listen here. You know what going on. Tomorrow 'round this same time, be out here."

(Tr. Day 4 at 18:16-23.) The next night, Lindquist waited at Club 75 for Edwards and Brooks. At approximately 1:00 a.m. Edwards and Brooks arrived at Club 75. Lindquist recounted the exchange that followed:

A. Brooks and Edwards pass--they pass in a car. I seen him. They went around, stopped to the light, went around, came up the one-way, stopped. Then I walked down the one-way, got in the car.

. . . .

. . . And I got in the car, and he asked me, "Everything cool?"

I was like, "Yeah, everything cool."

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 12

She, she, she never spoke.

Q. Who was driving the car?

A. Brooks was driving.

Q. Okay. And where were you at the time?

A. I was in the back seat.

Q. What side?

A. Behind the driver's side.

Q. All right. Go ahead. What happened next?

A. Then he asked me, "Everything cool?"

I tell him, "Yeah, everything cool."

Then Enid hand me over a bag, a brown paper bag, and tell me, "Brooks said he want 3,500 for this."

I looked at it. I know, I know what it was. And then I said, "All right." And then I left.

Q. What was it?

A. It was rock cocaine.

Q. What do you mean, rock cocaine?

A. Yeah, done cook.

Q. It was cooked cocaine?

A. Yeah.

Q. Do you know how much was it?

A. When I went home--when I looked in the bag, I could have--I see how was--but anyhow, I went home. I weighed it. It was four and a half ounces.

Q. What did you do with it?

A. I sold it.

(Tr. Day 4 at 19:13-20:24.)

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 13

The testimony of Moses, Lindquist, and Deeb establish that Edwards and Brooks regularly demanded money in exchange for drugs or property. These demands were typically made of individuals encountered by either Edwards or Brooks or both as a function of their police work. From this testimony, a rational jury could conclude that Edwards and Brooks were engaged in a pattern of racketeering activity. The testimony of Moses and Deeb further shows that Edwards and Brooks often engaged in racketeering acts together. From this, a rational jury could conclude that Edwards and Brooks had an agreement to engage in a pattern of racketeering activity. Lastly, the testimony of Love, Moses, Lindquist, and Deeb illustrated a pattern of demanding payments in exchange for controlled substances, favors, or property. Taken together, this evidence was sufficient for a rational jury to conclude that Edwards and Brooks intended to achieve the object of their conspiracy, namely, enriching themselves.

### 2.   Counts Three and Forty-Six--Drug Conspiracy

In Counts Three and Forty-Six, the jury found Edwards and Brooks guilty of conspiracy to possess controlled substances with the intent to distribute, in violation of Title Twenty-One, Section 846 of the United States Code. To sustain its burden of proof on a conspiracy charge, the government must show: (1) that two or more persons agreed to possess with the intent to

United States v. Edwards
Criminal No. 2010-36
Order
Page 14

distribute a controlled substance; (2) that the defendant was a

party to or member of that agreement; and (3) that the defendant

joined the agreement or conspiracy knowing of its objective to

possess with the intent to distribute a controlled substance and

intending to join together with at least one other alleged

conspirator to achieve that objective. *United States v. Rankin*,

870 F.2d 109, 113 (3d Cir. 1989); *United States v. Shoup*, 608

F.2d 950, 956 (3d Cir. 1979); *United States v. Uzzolino*, 651

F.2d 207, 214 (3d Cir. 1981); *United States v. Small*, 472 F.2d

818, 819 (3d Cir. 1971).

Knowledge of the object of a conspiracy may be established

from inferences based on circumstantial evidence, but a

conspiracy conviction may not be sustained by "inference as to

the defendant's knowledge based upon speculation." *Cartwright*,

359 F.3d at 287-88. The Third Circuit "has [consistently]

overturned convictions for conspiracy in drug possession and

distribution because of the absence of any evidence that the

defendant had knowledge that drugs were involved." *Cartwright,*

359 F.3d at 287 (quoting *United States v. Mastrangelo,* 172 F.3d

288, 293 (3d Cir. 1999)).

In *United States v. Wexler,* 838 F.2d 88 (3d Cir. 1988), the

defendant drove in a manner suggesting he was acting as a

"lookout" for a truck containing drugs, spoke to a co-

conspirator several times during the transaction, and signaled

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 15

to a *co-conspirator during the transaction. *Id.* at 91.

Additionally, the police found a CB radio purchased using a

false name in the car the defendant was driving. *Id.* That

evidence was insufficient to show that the defendant knew that

the transaction involved controlled substances. As the Third

Circuit explained,

> It is likely that [the co-conspirator] would associate
> in the scheme only with persons he believed would not
> go to the police. It is also more likely than not that
> [the defendant] suspected, if not actually knew, that
> some form of contraband was involved in the elaborate
> secretive arrangements for transport in which he
> participated. But these permissible inferences do not
> support a holding that the government met its burden
> to prove beyond a reasonable doubt that [the
> defendant] knew this was a conspiracy to transport
> hashish or even another controlled substance. The
> evidence is just as consistent, for example, with a
> conspiracy to transport stolen goods, an entirely
> different crime.

*Wexler,* 838 F.2d at 92.

In *United States v. Salmon,* 944 F.2d 1106 (3d Cir. 1991),

the defendant drove his car to the scene of a drug transaction

with other co-conspirators, performed surveillance, and spoke to

co-conspirators during a drug transaction. *Id.* at 1114. He also

opened the trunk of the car in the parking lot where the drug

deal occurred, and a co-conspirator walked to the trunk area

before performing the transaction. *Id.* The Third Circuit held

that the above evidence was insufficient to prove that the

defendant had the specific knowledge required to support a

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 16

conspiracy conviction. *Id* at 1115. The court reasoned that,

"even assuming, *arguendo*, that the cocaine was in the trunk, the

record contains no evidence that [the defendant] knew that the

bag contained a controlled substance such as cocaine as opposed

to anything else." *Id.*

In *United States v. Idowu,* 157 F.3d 265 (3d Cir. 1998), the

government presented the following evidence in connection with

the defendant:

> First, [the defendant] carried the brown leather bag
> containing the money. Second, [the defendant]
> apparently owned the bag, as evidenced by the fact
> that he kept personal documents in the bag. Third,
> [the co-conspirator] was willing to leave [the
> defendant] alone with the money. Fourth, [the co-
> conspirator] believed that it was safe to talk to [the
> seller] in the presence of [the defendant]. Fifth,
> [the defendant] was the one who showed [the seller]
> the money and who told [the seller] that he had
> checked it to ensure that it was all there. Sixth,
> [the defendant] opened the black suitcase to check the
> contents without being prompted by [the co-
> conspirator]. Seventh, the two defendants spoke
> Yoruban (a Nigerian dialect) together. Eighth, [the
> co-conspirator] urged [the defendant] to feel around
> in the suitcase. Ninth, [the defendant] had $3,000 in
> his pocket at the time he was arrested, which he
> presumably had skimmed from the stash.

*Id.* at 268.

Based on that evidence, the Third Circuit concluded that

"only two inferences are proper: that [the defendant] had some

kind of preexisting relationship with [the co-conspirator], and

that [the defendant] knew he was participating in some sort of

illegal transaction." *Id.* The evidence failed to support the

United States v. Edwards
Criminal No. 2010-36
Order
Page 17

critical inference that the defendant "knew he was participating in some sort of drug transaction." *Id.* The court reasoned that none of the participants referred to the subject of the transaction as "heroin" or "drugs" in the defendant's presence, but rather referred to "the stuff." *Id.* Additionally, the defendant did not take part in any of the recorded telephone conversations that preceded the transaction in question. *Id.* Accordingly, the court held that "it [wa]s unreasonable for a jury to infer that [the defendant] knew of the transaction's ultimate purpose." *Id.* at 269.

The Government may prove that actual controlled substances were involved through the use of circumstantial evidence. *See, e.g.*, *United States v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002) ("[T]he Government had to prove beyond a reasonable doubt that Johnson knowingly or intentionally possessed crack cocaine, cocaine, and marijuana with the intent of distributing them. . . . The Government could prove both Johnson's possession of these controlled substances and his intent through circumstantial evidence.").

In *United States v. Rivera*, 413 Fed. App'x 470 (3d Cir. 2011), the Court of Appeals for the Third Circuit considered a conviction of one defendant, Julian Joseph ("Joseph") for possession of controlled substances with intent to distribute. The evidence offered by the Government in support of this charge

United States v. Edwards
Criminal No. 2010-36
Order
Page 18

consisted of "numerous wiretapped conversations . . . ." *Id.* at

475. Several of these conversations consisted of Joseph and

another defendant, Sean Rogers ("Rogers") "arrang[ing]

deliveries" for certain dates and discussing the resale of

certain items. *Id.* Rogers testified that on each of the dates

discussed in the telephone conversations, Joseph "purchased two

'eightballs of crack cocaine" and the prosecution also presented

evidence that "purchases in these quantities is consistent with

the intent to repackage for resale and distribu[tion] of crack

cocaine." *Id.* Another witness testified that she assisted Joseph

in selling cocaine base and was present when Joseph received

deliveries of cocaine base for resale. *Id.* The court held that

this evidence was sufficient to support Joseph's conviction for

possession of controlled substances with intent to distribute.

*Id.*

> **a.   Count Three--August 2005 Conspiracy to Distribute**
> **Controlled Substance**

In Count Three, the Government alleges that, in or about

August, 2005, Edwards and Brooks conspired to sell marijuana to

Moses. To meet its burden of proof, the Government offered the

testimony of Moses. Moses testified that:

> A. This happened in late, if I'm not mistaken, it's in
> late 2005--August 2005. It was a few days after my
> birthday. My birthday is August 23rd, and it was, it
> was--between a week to eight days after my birthday.

> Q. Okay. Now describe exactly what happened.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 19

A. Well, what happened was I was sitting at the Contant car wash, because anybody wants to find me know they could find me at the car wash. I was sitting at the car wash.

[The defendants] came. They were driving west, going east, and I think they saw me or saw my jeep. They slowed down and went around the block, came down through the bend. The vehicle pulled up--

Q. What vehicle? Describe the vehicle.

A. The police cruiser.

Q. Who was driving?

A. Officer Brooks was driving at the time.

Q. Okay. What happened?

A. He turned down the window and waved to me like this (indicating). I went up to the window. He opened his hand. He had a small little sandwich plastic bag with a little marijuana in it.

So I looked at it. I say, "Are you get this?"

He say, "Yeah, we get a little thing."

I say, "Wah, how much are you looking for this?"

So he asked me how much I could get it for [*sic*] on the street.

I tell him, "Well, this could go for 16 easy, because the quality is good."

Q. What do you mean? What is "16"?

A. Sixteen hundred per pound.

Q. Okay.

A. So I went on to tell him, "Well, give me, give me what are you get. Let me deal with it, and just give me a good price. You know I going pay."

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 20

Q. What did you mean by that?

A. I was just asking him to--well, we use the word "front"--on the street. "Let me, let me sell it for you. Give me a good price. You know I going pay you."

Q. What happened after that?

A. But before, before he could have answered me, Officer Edwards jumped in and say, "No. No, sir. No way. Whatever we giving you, you got to pay for."

Q. Where was Ms. Edwards at that time?

A. She was sitting in the passenger seat.

Q. All right. Continue.

A. So when she said that, she said--she told me, "Well, you say you could get it, you could get 16 for it on the street. We'll give it to you for 8. You think it's only you alone want to build house?"

That was her words to me. So then I knew I wasn't going to get it. So I sit down and I thought quick. I know I had like $5,300 at home. I did the quick maths [*sic*] in my head. I say, okay 6 times 8 is 48. I told them I could buy 6 pounds.

. . . .

I told them I could purchase six pounds, but I don't have the money here. I have the money at home. I live . . . close to [the Four Corners neighborhood of St. Thomas]. So I told them, "Well, hey, you could meet me by the pay phones [in the Four Corners neighborhood]."

(Tr. Day 3 at 185:5-187:19.) Moses explained that he then went home, got the money, placed it in a bag, and waited for Brooks and Edwards to arrive at the designated meeting place. (Tr. Day 3 at 187:21-22.) When they arrived,

. . . Officer Brooks, who was driving, turned down the window, I could smell the marijuana . . . . I say, okay, in my mind they were serious.

So I handed him the bag.

Officer Edwards leaned over, picked up a plastic bag, hand it to [Brooks]. [Brooks] hand it to me, and I walked off.

. . . .

When I went home and opened it, the marijuana . . . was in three stacks. I weighed it. Each stack weighed two pounds.

(Tr. Day 3 at 188:1-16.) Moses further testified that he then smoked a portion of the marijuana himself. (Tr. Day 3 at 188:17-19.)

Based on that testimony, as well as other evidence adduced at trial, there was sufficient evidence for a reasonable juror to conclude that, in or about August, 2005, Edwards and Brooks conspired to sell marijuana.

### b.  Count Forty-Six--June 2009 Conspiracy to Distribute Controlled Substance

In Count Forty-Six, the Government alleges that, in or about June, 2009, Edwards and Brooks conspired to distribute cocaine base to Lindquist. To meet its burden of proof, the Government offered the testimony of Lindquist. As recounted above, Lindquist testified that in the summer of 2009, Brooks discovered Lindquist was carrying an unlicensed firearm at Club 75. (Tr. Day 4 at 18:16-19.) After saying to Edwards, "I got a

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 22

fish," Brooks told Lindquist, "Listen here. You know what going on. Tomorrow 'round this same time, be out here." (Tr. Day 4 at 18:21-23.)

The next night, Lindquist waited for Edwards and Brooks at Club 75. Edwards and Brooks arrived together in a car. (Tr. Day 4 at 19:13-14.) Lindquist got into the car and Brooks asked him, "Everything cool?" to which Lindquist replied in the affirmative. (Tr. Day 4 at 19:21-23). Edwards then handed Lindquist a bag containing four and a half ounces of crack cocaine. (Tr. Day 4 at 19:9-10, 19:13-14, 19:20-22.) As she handed him the bag, Edwards said, "Brooks said he want 3,500 for this." (Tr. Day 4 at 19:10.) Lindquist looked into the bag, recognized its contents, replied, "All right," and got out of the car. (Tr. Day 4 at 19:11-12.)

Over the course of the next several months, Lindquist sold the crack cocaine. He paid all of the proceeds to Brooks (Tr. Day 4 at 22:10-14.)

Given this testimony, the only evidence that Edwards was a member of the conspiracy was her presence when Brooks initially found a gun on Lindquist, and that she later handed Lindquist a bag of drugs, saying "Brooks said he want 3,500 for this." Brooks instructed Lindquist where to meet them for the transaction and Brooks alone collected all of the proceeds from Lindquists' sale of the drugs. Ordinarily, mere presence at the

scene of the crime or association with a criminal is not sufficient evidence of a conspiracy. *See, e.g.*, *United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011) (holding that a defendant's presence at the arrest of and prior dealings with the alleged co-conspirator were insufficient to sustain a conspiracy conviction); *United States v. Terselich*, 885 F.2d 1094, 1098 (3d Cir. 1998) (stating that "the company an individual chooses to keep" is not evidence of a conspiracy.) Moreover, the defendant's active participation in a suspicious transaction was not sufficient to sustain his conviction in *Idowu*, because there was no evidence the defendant "knew of the transaction's ultimate purpose," namely, distributing drugs. *Idowu,* 157 F.3d 265 at 269.

Here, it is unclear that Edwards ever was aware of the transaction's ultimate purpose. Brooks never discussed the sale of drugs in Edwards's presence, only saying that he "got a fish" and telling Lindquist to meet them the following night. Edwards also handed Lindquist the crack cocaine in a paper bag. Lindquist testified that he recognized the contents only after looking inside the bag. Edwards's statement--"Brooks said he want $3,500 for this"--does not evidence that she knew the contents of the bag. Brooks alone collected all of the proceeds of Lindquist's sale of the drugs.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 24

While this evidence may be sufficient to support an inference that Brooks distributed drugs to Lindquist, it is not enough to support the charge that Brooks conspired with Edwards to distribute those drugs. In the absence of evidence that Edwards was aware of the ultimate purpose of the transaction, a reasonable jury could not conclude that Edwards joined in a conspiracy with Brooks to distribute crack cocaine.

For similar reasons, a reasonable juror could not conclude that Brooks joined in any conspiracy to distribute crack cocaine. No potential conspirator, other than Edwards, was ever identified by Lindquist or through other evidence.

### 3.  Count Four--Drug Possession with Intent to Distribute (August 2005)

In Count Four, the jury found Edwards and Brooks guilty of possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841. To sustain its burden of proof on a conspiracy charge, the government must show: (1) that the defendant possessed a mixture or substance containing a controlled substance; (2) that the defendant possessed the controlled substance knowingly or intentionally; and (3) that the defendant intended to distribute the controlled substance. *United States v. Barbosa*, 271 F.3d 438 (3d Cir. 2001), *United States v. Vasquez*, 271 F.3d 93 (3d Cir. 2001).

Here, as recounted above, the Government presented Moses's

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 25

testimony that in August, 2005, Brooks and Edwards made an arrangement with Moses to sell marijuana. (Tr. Day 3 at 185:5-187:19.) Moses testified that he received this marijuana from Brooks and Edwards and that he later weighed it, determining it to be six pounds. (Tr. Day 3 at 188:1-16.) From Moses's testimony, a rational jury could find that Edwards and Brooks possessed marijuana with the intent to distribute it.

   4.   **Counts Five and Thirty-Nine--Hobbs Act Conspiracy**

   In Counts Five and Thirty-Nine, the jury found Edwards and Brooks guilty of conspiracy to interfere with interstate commerce by extortion, in violation of Title Eighteen, Section 1951 of the United States Code. To sustain its burden of proof on this charge, the government must show: (1) that two or more persons agreed to interfere with interstate commerce by extortion under color of official right; (2) the defendant was a party to or member of that agreement; and (3) the defendant joined the agreement or conspiracy knowing of its objective to interfere with interstate commerce by extortion under color of official right and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective. *United States v. Traitz*, 871 F.2d 368, 380-81 (3d Cir. 1989), *United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 26

1972).

### a.  Count Five--July 2007 Conspiracy to Extort Love

In Count Five, the Government alleges that in July 2007 Edwards and Brooks conspired to interfere with interstate commerce by extorting Love.

Love testified that Edwards and another officer told Love that he would need to pay them for the return of his automobile, a pick-up truck, after he drove it into a ditch. The truck had crashed into a tree and a chain-link fence. The rear of the truck hung precariously over the edge of the road, such that it was suspended "five foot [*sic*] off the ground." (Tr. Day 3 at 103:7.) Love stated that the towing company that retrieved his truck had used both a towing truck and a backhoe to extricate Love's vehicle. (Tr. Day 3 at 156:22-157:14.) Love also was told by a representative of the towing company that Edwards had supervised the retrieval of Love's truck. (Tr. Day 3 at 157:10-14.)

Thereafter, Love met with Edwards at a police station about obtaining his car, which he had learned was impounded. Edwards placed Love in the rear of a police vehicle and drove to meet another police officer, who wore a nametag which bearing the name "Brooks." Love did not identify Brooks at trial, stating that he did not have his glasses and that his eyes were getting "blurry." (Tr. Day 3 at 112:21-113:5.)

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 27

Love stated that after driving around with both officers for some time, Edwards told him that it would cost $1,200 to retrieve his vehicle. (Tr. Day 3 at 114:11-12.) When Love replied that he only had approximately $300 on him, Edwards began talking about "being a police officer for nineteen years," and that "she had been doing this for 19 years, taking money for, you know, for people--from people." (Tr. Day 3 at 114:19-115:8.) After which, Edwards told Love it would cost him $900 to retrieve his vehicle. (Tr. Day 3 at 117:3-5.) Love was then let out of the vehicle to get more money. (Tr. Day 3 at 117:6-8.)

Thereafter, Love withdrew $1,400 from his bank account. (Tr. Day 3 at 119:5.) The Government also submitted Love's withdrawal receipt, showing a withdrawal on August 6, 2007, in the amount of $1,400. (Gov't's Ex. 21d-2.)

Love returned to a police station and was again placed in a police car. (Tr. Day 3 at 122:11-15.) After picking up Brooks, Edwards drove around St. Thomas for approximately two to three hours. (Tr. Day 3 at 140:9-16.) Eventually, Edwards told Love it would cost $800 to retrieve his car. (Tr. Day 3 at 143:25-144:6.) Love then testified:

> A. I pulled the money out and counted it out and put it on the dash of the police car.
>
> Q. Why did you put it on the dash of the police car?
>
> A. That's where I was told to put it at.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 28

> Q. Who told you to put it on the dash of the police
> car?
>
> A. Ms. Edwards.

(Tr. Day 3 at 144:9-15.)

After Love placed the $800 on the dashboard of the police

vehicle, a tow-truck driver arrived with Love's pick-up truck.

(Tr. Day 3 at 144:16-21.). Love then looked over his vehicle,

and described what happened next as follows:

> A. Well, they come back to check and make sure that
> everything was fine on my vehicle. And I seen he had
> some money in his hand.
>
> Q. You say who had some money in his hand?
>
> A. The tow truck driver.
>
> Q. . . . . What did you see, as far as him having
> money in his hand?
>
> A. I mean, like he had a couple hundred dollars, like,
> I know it was hundred dollar bills, and then some
> smaller bills.

(Tr. Day 3 at 145:1-10.) Before Love left with his truck, he had

a brief conversation with Edwards:

> A. . . . . We had talked about, told them I was going
> to be off-island, and I would be back in a couple of
> weeks. And she said she would be back in touch with me
> to talk about the tickets, money for the tickets.
>
> Q. What tickets?
>
> A. I guess tickets they were going to give me or write
> me, I don't know.
>
> . . . .

    . . . . I think one, if I remember right, I think one was like fleeing the scene, and the other one was driving under the influence, if I remember right.

Q. Did you pay her for those tickets then?

A. I just, whatever the money was for. I got not a clue what it was for.

Q. . . . [W]hat else was said between you and Ms. Edwards before you left?

A. Just pretty much, she'd be in contact with me. . . .

Q. Did you receive a written citation from Officer Edwards for anything?

A. No, sir.

Q. Did you receive a written citation from the other officer that you've named as Brooks?

A. No, sir.

Q. As far as the event on that particular day, have you ever received a written citation?

A. No, sir.

(Tr. Day 3 at 145:17-146:19.) Love subsequently testified about

a receipt he received from the towing company:

Q. When did you get that receipt?

A. They gave it to me when I picked my truck up.

Q. Who gave it to you?

A. The tow truck driver.

    . . . .

Q. Towing charge, how much?

A. $175.

Q. And labor charge, what?

A. 600.

Q. And what does it show for storage?

A. $50.

Q. A total of 825, correct?

A. Yes sir.

(Tr. Day 3, 148:2-148:5; 150:1-150:8.)

The tow-truck driver, Cliff Tonge ("Tonge"), also testified to the difficulty in extracting Love's vehicle. Tonge initially attempted to pull Love's truck out with a tow truck, "[b]ut it couldn't come out because it had a big pole and a tree chock up, where part of the back wheel and the bed is . . . . The whole truck was over the cliff. . . . [O]nly one wheel was barely touching land." (Tr. Day 5 at 387:7-14.) Tonge then enlisted the aid of a friend with a backhoe. (Tr. Day 5 at 387:18-388:7.) Tonge then had his friend use the arm of the backhoe to lift the truck while Tonge used his tow-truck to pull Love's truck back onto the road. (Tr. Day 5 at 390:17-24.)

Love's testimony, considered along with Tonge's testimony, was not sufficient for a rational jury to conclude that Edwards, acting under color of official right, extorted Love. Love did not testify to Edwards taking any portion of the $825. He only placed the bills on the dashboard of the vehicle she was in.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 31

Thereafter, he saw the tow-truck driver with several hundred dollar bills. Love also received an itemized receipt from the towing company. Further, Tonge testified to the difficulty he had in retrieving Love's truck from its precarious position.

Although the government is entitled to all favorable inferences, it is not entitled to specific or impermissible inferences. Edwards's behavior towards Love may have been suspicious, but that alone is not sufficient to sustain her conviction on this count. Making Love sit in her police vehicle for several hours at a stretch is peculiar, but it does not transform Edwards's conduct into a crime. The statement about how she had been doing "this" for years, while arguably unusual, does not demonstrate a criminal intent.

It is even less clear with whom Edwards allegedly conspired. To begin with, Love could not identify Brooks at trial. Moreover, the entire exchange recounted by Love occurred between Love and Edwards. Even if Brooks were present and driving the car, mere presence at the scene of the crime or association with a criminal is not sufficient evidence of a conspiracy. *See, e.g.*, *United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011) (holding that a defendant's presence at the arrest of and prior dealings with the alleged co-conspirator were insufficient to sustain a conspiracy conviction); *United States v. Terselich*, 885 F.2d 1094, 1098 (3d Cir. 1998) (stating that

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 32

"the company an individual chooses to keep" is not evidence of a
conspiracy.). Accordingly, no rational jury could find that
Brooks or anyone else participated in the alleged extortive
scheme.

> **b.   Count Thirty-Nine--Summer 2009 Conspiracy to Extort Lindquist**

In Count Thirty-Nine, the Government alleges that Edwards
and Brooks conspired to extort Lindquist by forcing him to sell
illegal drugs in exchange for not being arrested for unlawfully
possessing a firearm.

As discussed above, Lindquist testified that, in or about
June of 2009, he was forced to pay money to Edwards and Brooks
in exchange for Brooks not arresting him for unlawfully
possessing a firearm. (Tr. Day 4 at 18:15-22:24.) Lindquist
testified that after Brooks discovered Lindquist carrying an
unlicensed firearm for the second time, he declared to Edwards,
"I got a fish. I got a fish." (Tr. Day 4 at 18:21.) He further
testified that Brooks then ordered Lindquist to meet Brooks and
Edwards the following night. (Tr. Day 4 at 18:22-23.)

The following night, as discussed above, Lindquist met
Edwards and Brooks in a car. (Tr. Day 4 at 19:12-17.) Lindquist
got into the car, which Brooks was driving. Brooks asked,
"Everything cool?" (Tr. Day 4 at 19:21-22.) Lindquist replied
"Yeah, everything cool." (Tr. Day 4 at 19:23.) Edwards then

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 33

handed Lindquist a bag and said, "Brooks said he want 3,500 for

this." (Tr. Day 4 at 20:10.) Lindquist looked in the bag, saw

that it contained rock cocaine, and then said, "All right." (Tr.

Day 4 at 20:12.) Lindquist then got out of the vehicle. (Tr. Day

4 at 20:12.)

Lindquist further testified that during the months that it

took him to sell the cocaine foisted upon him, he would provide

the proceeds of those sales to Brooks:

A. Then I went home, weighed it and then I sold it.

Q. How long did it--after you sold it, what did you do
with the proceeds?

A. I paid Officer Brooks.

Q. How long did it take you to pay Officer Brooks?

A. A couple months.

Q. Did you pay him in the same fashion this time as
you had the first incident with him?

A. Yes.

Q. When did you sell the last bit of the drugs that
you got from them?

A. October 22nd, 2009.

Q. What happened after that, you sold that last bit of
drugs you got from them?

A. After that, I was, I was on a balance of $1,500.
And I gave him the $1,500.

(Tr. Day 4 at 22:9-22:24.) Lindquist explained that the street

value of the drugs was only $1,500-$1,750. (Tr. Day 4 at 21:17-

18.)

United States v. Edwards
Criminal No. 2010-36
Order
Page 34

As discussed above, the evidence adduced at trial does not support the charge that Edwards participated in the scheme to sell drugs. A trickier question is whether this evidence bears the earmarks of a joint undertaking to extort. "The Hobbs Act is intended to address a situation where a defendant is caught in public office, promising to misuse his office once he receives payment." *United States v. Manzo*, 636 F.3d 56, 67 (3d Cir. 2011). To qualify as extortion, the payment to the defendant must be "the product of . . . reasonably induced fear . . . ." *United States v. Critchley*, 353 F.2d 358, 361 (3d Cir. 1965).

Here, the quid-pro-quo relationship between Brooks and Lindquist is clear: in exchange for not being arrested, Lindquist paid Brooks a certain sum of money. As Brooks found the gun on Lindquist, Lindquist had good reason to fear that Brooks might use this discovery as the basis for an arrest.

It is not entirely clear whether Lindquist had a similarly good reason to fear that Edwards might use the gun found by Brooks as the basis for arresting Lindquist. In *United States v. Caraballo-Rodriguez*, 480 F.3d 62 (1st Cir. 2007), the Court of Appeals for the First Circuit considered whether a police officer had a higher duty to report a felony than an ordinary citizen. There, the defendant, Osvaldo Caraballo-Rodriguez ("Caraballo"), helped protect a drug transport. *Id.* at 64. Although he partially participated in the conspiracy, he also

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 35

took the unusual step of providing an anonymous tip to the Drug

Enforcement Administration about the existence of the

conspiracy. *Id.* Nonetheless, Caraballo was convicted of

misprision of a felony. *Id.*

On appeal, Caraballo challenged his conviction on the

grounds that he had engaged in no affirmative act of concealment

of any crime. *Id.* at 70. The government countered that

"Caraballo had higher duties as a police officer." *Id.* at 75.

Specifically, the government claimed that police officers have

"obligations . . . to disclose information about crimes,

irrespective of whether civilians would have had such a duty."

*Id.* The First Circuit further noted that "Caraballo was, at the

time, a police officer who had an affirmative duty to act on

information about a crime under Puerto Rican law." *Id.* (citing

P.R. Laws Ann. tit. 25, § 3102 (duty of the "Puerto Rico Police"

is to "prevent, discover, investigate and persecute [*sic*] crime

and, within the scope of its authority, enforce obedience of the

laws"). Although the First Circuit did not pass on the merits of

this theory, it did find that Caraballo's conviction was not

plain error. *Id.* at 76.

In the Virgin Islands, the Police Commissioner has the duty

to "prevent, detect and repress crime; and, within the sphere of

his authority, enforce obedience to the laws . . . ." V.I. Code

Ann. tit. 23 § 1. All members of the Virgin Islands police force

United States v. Edwards
Criminal No. 2010-36
Order
Page 36

are charged with "perform[ing] such duties as may be assigned to them by the Police Commissioner." V.I. CODE ANN. tit. 23 § 8(a).

Lindquist knew Edwards was a police officer. Although Edwards did not directly threaten Lindquist, "[t]he fear experienced by the victim does not have to be the consequence of a direct threat. Rather, extortion is found if the circumstances render the victim's fear reasonable." *United States v. Haimowitz*, 725 F.2d 1561, 1572 (11th Cir. 1984).

In *United States v. Haimowitz*, 725 F.2d 1561 (11th Cir. 1984), a restaurant needed a liquor license to operate as a supper club. *Id.* at 1572. The defendant pressured the restaurant owner to pay $15,000 to obtain the liquor license. *Id.* In particular, the defendant told the restaurant owner that a state politician was so upset he was going to "quit helping" and that the defendant did not know what that meant. *Id.* Nonetheless, the defendant argued that he did not instill fear--the fear came from the politician--and because at the time the victim made the payment, the victim was cooperating with federal law-enforcement authorities. *Id.*

The Court of Appeals for the Eleventh Circuit affirmed the district court's finding that the victim-restaurant owner had a reasonable fear of economic loss. The court agreed with the district court that "the Hobbs Act forbids attempted extortion as well as actual extortion. Therefore, in a case where the

F.B.I. foils the actual offense, it is possible for one to commit attempted extortion." *Id.* The Eleventh Circuit also agreed with the district court that, while the defendant may not have directly extorted the victim, the defendant "was part of a scheme by which [the politician] used his official office to extort money from [the victim]." *Id.* The Eleventh Circuit noted that "in proving the crime of extortion, where intent must be inferred from ambiguous statements and situations, the jury's verdict must be accorded substantial weight." *Id.* (quoting *United States v. Duhon*, 565 F.3d 345, 352 (5th Cir. 1978)).

Here, Lindquist testified that he was paying the $3,500 "for the drugs and the gun." (Tr. Day 4 at 21:15.) Although this statement is not entirely clear, it is a fair inference that Lindquist meant by this that he was paying the $3,500 in part to avoid being arrested for possessing an unlicensed firearm. Courts have noted that fear "may be present even if confrontations between the victim and the alleged extorter appear friendly . . . ." *United States v. DeMet*, 486 F.2d 816, 820 (7th Cir. 1973); *see also United States v. Hyde*, 448 F.2d 815, 834 (5th Cir. 1971) ("The fact that relations between the victims and the extorters were often cordial is not inconsistent with extortion. Knowing that they were at the mercy of the Attorney General's office, it is a fair inference that the

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 38

victims felt that to save their businesses they had to keep the

extorters satisfied.")

In *United States v. DeMet*, 486 F.2d 816, 820 (7th Cir.

1973), the victim testified that his interactions with the

defendant were often "friendly" and the defendant "never said

nor intimated he would cause 'trouble,' . . . ." *Id.* at 819. The

defendant challenged his conviction for extortion on the ground

that the victim's conduct was not motivated by fear, but that

instead the victim "willingly gave money to [the] defendant

because it brought certain advantages . . . ." *Id.* The Court of

Appeals for the Seventh Circuit affirmed the conviction, noting

that

> [w]hile portions of [the victim's] testimony taken
> with other evidence may be consistent with [the]
> defendant's view that King freely gave money and
> liquor to obtain advantages, the jury could reasonably
> infer from all the circumstances, including
> defendant's official position, that [the victim] was
> in fear . . . , his fear was reasonable, and the
> defendant exploited it to extort money and liquor.

*Id.* at 820.

Lindquist's recollection of his exchanges between Brooks

and Edwards may be consistent with the view that Lindquist

freely gave them money. However, the jury could reasonably infer

from all the circumstances, including Brooks's and Edwards's

official positions, that Lindquist was in fear of being

arrested, that his fear was reasonable given that he was found

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 39

with an unlicensed firearm, and that Brooks and Edwards

exploited Lindquist's fear for money.

Drawing all inferences from the evidence in favor of the

Government, a reasonable juror could find that Lindquist had "a

reasonably induced fear" that Edwards might arrest him or report

his possession of an unlicensed firearm if he did not pay

Brooks. As in *Haimowitz*, Edwards did not make an express threat,

but rather relayed that a third-party--Brooks--expected payment.

From this evidence, a rational jury could conclude that Edwards

intended to exploit Lindquist's fear of being arrested by either

herself or Brooks.

For similar reasons, the evidence is sufficient to support

Brooks's conviction for conspiracy to extort. In exchange for

not being arrested by Brooks for unlawful possession of a

firearm, Lindquist was forced to pay $3,500 for four-and-a-half

ounces of crack cocaine. Moreover, Lindquist testified that the

street value of the drugs given to him was only approximately

$1,500-$1,750. (Tr. Day 4 at 21:17-18.) This means that

Lindquist overpaid by as much as $2,000 for the drugs. Indeed,

Lindquist testified that after selling the drugs he still owed

Brooks $1,500. (Tr. Day 4 at 22:23-24.) Further, Edwards's

presence at the time Brooks found the gun, and her duties as a

police officer, support the inference that Edwards and Brooks

entered into an agreement to extort Lindquist. Lindquist could

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 40

have reasonably feared that Edwards would arrest him. Thus, the
evidence is sufficient for a rational jury to find that Brooks
and Edwards entered into a conspiracy to interfere with
interstate commerce by extorting Lindquist.[1]

## 5. Counts Six, Twenty-Five, Thirty-Four, and Forty--Hobbs Act Extortion

In Counts Six, Twenty-Five, Thirty-Four, and Forty, the
jury found Edwards and Brooks guilty of interfering with
interstate commerce by extortion, in violation of Title
Eighteen, Section 1951 of the United States Code ("section
1951"). In Count Thirty-Four, the jury found Brooks guilty of
interfering with interstate commerce by extortion, in violation
of section 1951. To sustain its burden of proof on these
charges, the government must show: (1) that the defendant took
property from an individual; (2) that the defendant did so
knowingly and willfully by extortion under color of official
right; and (3) that as a result of the defendant's actions,
interstate commerce was obstructed, delayed, or affected. *United
States v. Traitz*, 871 F.2d 368, 380-81 (3d Cir. 1989), *United
States v. Driggs*, 823 F.2d 52 (3d Cir. 1987). In *Driggs*, the

---

[1] While Count Forty-Six involves the same underlying conduct and may
suggest the same outcome, the different outcomes are easily reconciled. The
Court notes that while there was no evidence that Edwards joined a conspiracy
to distribute drugs as alleged in Count Forty-Six, there is sufficient
evidence here that Edwards knew of, and participated in, a scheme to obtain
money from Lindquist. Although the money Brooks ultimately obtained involved
the sale of drugs, this fact, without evidence of Edwards's knowledge of it
and agreement to it, is insufficient to support her conviction under Count
Forty-Six.

United States v. Edwards
Criminal No. 2010-36
Order
Page 41

court noted: "The essential elements that the government must prove are that the defendant obstructed, delayed or affected commerce or attempted to do so; by extortion ("the obtaining of property from another, with his consent, . . . under color of official right"); and that the defendant acted knowingly and willfully." 823 F.2d at 54.

### a.    Count Six--July 2007 Extortion of Love

In Count Six, the Government alleged that Edwards and Brooks extorted Love. Here, as discussed above, Love testified that he placed $825 on the dashboard of the police vehicle in exchange for obtaining his truck. (Tr. Day 3 at 143:18-144:18.)

As discussed above, Love's testimony is not sufficient to show that he was the victim of an extortive scheme. Love never saw Edwards take the money and he later received a receipt from the towing company, itemizing the expenses. The amount Love paid is consistent with his testimony regarding the precarious position his car was in and the difficulty the towing company had in retrieving Love's car. Although Edwards may have behaved suspiciously, there was not sufficient evidence for a rational jury to conclude that Edwards extorted Love.

The evidence against Brooks was even more scant. Love did not speak with Brooks and did not give any money to Brooks. Love could not identify Brooks at trial. The entire exchange recounted by Love occurred between Love and Edwards. Thus, the

evidence was not sufficient for a rational jury to conclude that

Brooks extorted Love.

### b.   Count Twenty-Five--April 2008 Extortion of Morino

In Count Twenty-Five, the Government alleges that Edwards

and Brooks extorted Jossenel Morino ("Morino"). At trial, Morino

testified that after his girlfriend, Yvese Calixte ("Calixte")

was arrested by the Port Authority Police, Edwards and Brooks

offered to have Calixte released in exchange for money:

> A. They tell me the police station doing papers work
> [*sic*], that they could take my girlfriend to the jail.
>
> I asked them what my girlfriend did, for her to go to
> prison.
>
> They tell me, if I don't want my girlfriend to go to
> prison, if I give a thousand dollars, my girlfriend
> will not go to jail.
>
> Q. Now, who said that to you?
>
> A. Brooks and [Edwards].
>
> . . . .
>
> THE COURT: Mr. Morino, who is it that said the words?
>
> THE WITNESS: Both of them.
>
> THE COURT: Explain how you mean, both of them said the
> words?
>
> THE WITNESS: Enid was the passenger. Brooks was
> driving. I stand up by Brooks' car--his door. They
> tell me if I give a thousand dollars, my girlfriend
> would not go to jail.
>
> THE COURT: Now, you said "They tell me." Who used the
> words?

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 43

THE WITNESS: Mr. Brooks.

THE COURT: Go ahead.

BY MR. LINDQUIST:

Q. And when Mr. Brooks told you that, where was Enid?

A. Enid was sitting on the police--on the next seat for the police car.

Q. After Brooks told you that, what happened then?

A. I told them, "I don't have a thousand dollars on me. I have $500."

Q. How--what did they say to that?

Or what was said to that?

A. They tell me to give them the $500, and then you'll give--pay the rest tomorrow morning.

Q. Which one of them told you to give you--to give $500?

A. (Answering)

THE INTERPRETER: He say, "Brooks and Enid, because both of them was talking to each other."

BY MR. LINDQUIST:

Q. Did you--

THE COURT: Who is it that told you, "Give $500"?

THE WITNESS: Brooks.

THE INTERPRETER: He say, "Both of them were talking to each other. They're saying, 'If you give me $500, your girlfriend is not going to the jail.' "

THE COURT: Go ahead.

BY MR. LINDQUIST:

Q. Did you give them $500?

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 44

A. Yes.

Q. Of the two of them, who took the $500 from you?

A. Enid [Edwards].

(Tr. Day 4 at 166:16-168:21.)

The Government also presented Morino's testimony that Edwards would secure Calixte's release in exchange for a payment of money:

Q. What happened next?

A. Then they tell me [John-Baptiste] will return my girlfriend to me.

Q. Who told you that?

A. Enid and Brooks tell me Bill will take my girlfriend downtown to the Territorial Court.

Q. Who told you that?

A. Enid [Edwards] and Brooks.

(Tr. Day 4 at 172:6-13.)

This evidence, taken together, was sufficient for a rational jury to conclude that Edwards and Brooks, acting under color of official right, extorted Morino; and that this extortion affected interstate commerce.

### c. Count Thirty-Four--February 2009 Extortion of Lindquist

In Count Thirty-Four, the Government alleges that Brooks extorted Lindquist in or about February 2009. As discussed above, the Government presented Lindquist's testimony that Brooks demanded payments of money after finding Lindquist in

United States v. Edwards
Criminal No. 2010-36
Order
Page 45

possession of an unlicensed firearm for the first time.

Lindquist testified that:

I was smoking a joint.

He came, he asked me if I didn't know better than smoking out here. And he asked me where is the rest of the weed.

I tell him I ain't had no more weed.

And I had a gun in my waist. And I was sitting down, and he seen the butt. And he reached down and he grabbed it.

He asked me, "What's this?"

And I tell him, "Oh God, can you give me a break?"

And he tell me, "We going work something out." He tell me, "I know where to find you."

And I took off walking--he tell me "Go." I took off walking over the hill and I left. And then I look back, I just look back just to make sure if this was happening for real, and then I left.

And about a week, week later or so, he came in Contant, next to Asylum Bar, where I be out on the spot hanging out. He pull up. He say, "You got money for me"?

I tell him, "I ain't got all, but"--

BY MR. PAIGE:

Q. Let me ask you this. You said "money." Did you all discuss an amount the first time he talked to you?

A. He told me he want $2,000.

Q. What was he wearing when this happened?

A. When I look back, he, all he was wearing is a T-shirt, a police T-shirt.

United States v. Edwards
Criminal No. 2010-36
Order
Page 46

Q. So did you have any money for him?

A. I had to give him $2,000.

Q. Did you do that?

A. Yes.

Q. When did you do that?

A. It wasn't all at one time.

Q. How long did it take you to pay him $2,000?

A. About a month.

Q. Describe how this went about.

A. Usually he would just come in the area where I be hanging at, on the turf, and pull up, and I would just hand him whatever money I had, and just keep deducting it all the time.

Or if I see him to a club--or one time to the Green House--wherever I see him, once he see me, I had money, I had to give it to him until the bill was paid off.

(Tr. Day 4 at 15:22-17:16.)

From this evidence, a reasonable juror could conclude that Brooks took money by extortion, under color of official right, and that this affected interstate commerce.

### d. Count Forty--Summer 2009 Extortion of Lindquist

In Count Forty, the Government alleges that Edwards and Brooks extorted Lindquist approximately three to four months after the February 2009 extortion. As discussed above, Lindquist testified that Lindquist paid money to Brooks after the second time that Brooks found Lindquist with an unlicensed firearm.

United States v. Edwards
Criminal No. 2010-36
Order
Page 47

As discussed above, there is sufficient evidence for a reasonable jury to conclude that Edwards participated in the scheme to extort Lindquist. While Edwards may have been involved in the effort to sell drugs, her position as a police officer and her statement to Lindquist is sufficient to support a finding that she intended to exploit Lindquist's fear of being arrested. Thus, there is sufficient evidence for a rational jury to find that Edwards extorted Lindquist in the summer of 2009.

Similarly, there was sufficient evidence for a rational jury to conclude that Brooks, acting under color of official right, extorted Lindquist; and that this extortion obstructed interstate commerce.

### 6. Counts Ten, Twenty-Nine, Thirty-Six, and Forty-Three--Extortion

In Counts Ten, Twenty-Nine, and Forty-Three, the jury found Edwards and Brooks guilty of extortion, in violation of Title Fourteen, Section 701 of the Virgin Islands Code ("section 701"). In Count Thirty-Six, the jury found Brooks guilty of extortion in violation of section 701. To sustain its burden of proof on this charge, the government must show: (1) that the defendant took property from an individual; (2) that the defendant did so knowingly and willfully by extortion; and (3) that the defendant did so under color of official right. V.I. CODE ANN. tit. 14, § 701 ("Extortion is the obtaining of property

from another person, with his consent, induced by a wrongful use

of force or fear, or under color of official right.").

### a.    Count Ten--July 2007 Extortion of Love

In Count Ten, the Government alleges that Edwards and

Brooks extorted Love. As recounted above, Love testified that he

paid $825 in order to obtain his vehicle. Love testified only

that he place the money on the dashboard of Edwards's police

vehicle, that he later saw the tow-truck driver with some money,

and that he later received a receipt from the towing company for

the full amount. Even with Edwards's suspicious behavior, this

evidence is not sufficient for a rational jury to conclude that

Edwards extorted Love.

Similarly, no rational jury could infer from these facts

that Brooks had also committed extortion. Love spoke only with

Edwards. Love could not identify Brooks at trial. Thus, this is

not sufficient to support Brooks's conviction on this count.

### b.    Count Twenty-Nine--April 2008 Extortion of Morino

In Count Twenty-Nine, the Government alleges that Edwards

and Brooks extorted Morino. Here, as discussed above, Morino

testified that he paid $500 to Edwards and Brooks in exchange

for the release of Calixte from custody. Morino stated that to

make a payment to her or else Edwards and Brooks would take

Calixte to jail. Edwards made it clear that payment to her and

Brooks would ensure that Calixte did not have to spend the night

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 49

in jail. Morino also testified that when he told Brooks that he did not have the $1,000 that Brooks had demanded, and instead had $500, that Brooks stated that $500 would prevent Calixte from going to jail.

This evidence, considered with the evidence recounted above, was sufficient for a rational jury to find that Edwards and Brooks knowingly and willingly extorted money from Morino in their capacity as police officers.

### c.   Count Thirty-Six--February 2009 Extortion of Lindquist

In Count Thirty-Six, the Government alleges that Brooks extorted Lindquist after discovering him in possession of an unlicensed firearm in or about February 2009. As discussed above, Lindquist testified that Brooks demanded payments of money after finding Lindquist in possession of an unlicensed firearm. Lindquist testified that Brooks stated that he and Lindquist would "work something out" after Lindquist asked for "a break" on the possession of an unlicensed firearm. Lindquist further testified that he ultimately made payments to Brooks of $2,000.

This evidence was sufficient for a rational jury to find that Brooks, acting under color of official right, knowingly and willing extorted money from Lindquist.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 50

### d. Count Forty-Three--Summer 2009 Extortion of Lindquist

In Count Forty-Three, the Government alleges that Edwards and Brooks extorted Lindquist in the summer of 2009. As discussed above, Lindquist testified that, after being found with an unlicensed firearm, he paid Brooks $3,500 for four-and-a-half ounces of crack cocaine worth only approximately $1,500-$1,750. Lindquist testified that Edwards handed him a bag filled with the cocaine and told him that Brooks wanted $3,500 for it. (Tr. Day 4 at 18:15-20:12.) Lindquist recounted that he sold the drugs, giving the proceeds to Brooks, and also paid Brooks a lump sum of $1,500. (Tr. Day 4 at 22:9-24.)

As discussed above, there is sufficient evidence for a rational jury to conclude that Edwards participated in this extortive scheme as Lindquist could have reasonably feared Edwards would arrest him. Although there was no evidence that Edwards received any of the money, there was evidence that Edwards knew a crime was being committed, as she witnessed Brooks find a gun on Lindquist and subsequently demand payment. Moreover, with this knowledge, Edwards relayed Brooks's demand for payment and gave Lindquist a bag containing crack cocaine. These actions evince an intent that the crime of extortion be committed. Accordingly, there was sufficient evidence for the

jury to find that Edwards aided and abetted in Brooks's

extortion of Lindquist.

Similarly, this evidence was sufficient for a rational jury

to find that Brooks, acting under color of official right,

knowingly and willing extorted money from Lindquist.

### 7. Counts Eleven, Thirty, Thirty-Seven, and Forty-Four-- Bribery

In Counts Eleven, Thirty, and Forty-Four, the jury found

Edwards and Brooks guilty of solicitation or receipt of a bribe,

in violation of Title Fourteen, Section 403 of the Virgin

Islands Code ("section 403"). In Count Thirty-Seven, the jury

found Brooks guilty of solicitation or receipt of a bribe, in

violation of section 403. To sustain its burden of proof on this

charge, the government must show: (1) that, at the time alleged

in the indictment, the defendant was a public official; (2) that

the defendant asked for or received any emolument, gratuity, or

reward, or any promise thereof that was not provided by law; and

(3) that the defendant did so for an official act. 14 V.I.C.

§ 403 ("Whoever, being a judicial or other public officer or

employee, asks or receives any emolument, gratuity, or reward,

or any promise thereof, except such as may be authorized by law,

for doing any official act, shall be" guilty of solicitation or

receipt of a bribe.).

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 52

### a.   Count Eleven--July 2007 Bribe from Love

In Count Eleven, the Government alleges that Edwards and Brooks received a bribe from Love in exchange for the return of his vehicle. The Chief of the VIPD, Rodney Querrard ("Querrard") testified that Edwards had been a VIPD officer for approximately "22-plus years." (Tr. Day 1 at 63:10-11.) He further testified that Edwards was a police officer continuously from 2000 until 2010, covering all times alleged in the indictment. (Tr. Day 1 at 64:1-3.) Querrard further testified that Brooks was a police officer continuously from 2000 until 2010, covering all times alleged in the indictment. (Tr. Day 1 at 65:25-66:3.)

As discussed above, there is no evidence that Edwards took any portion of the money Lindquist paid to have his truck returned. Lindquist later saw the tow-truck driver with some money and received a receipt from the towing company for the full amount. Based on the evidence adduced at trial, a rational jury could not conclude that Edwards accepted a bribe from Love.

Similarly, no rational jury could infer from this evidence that Brooks accepted a bribe. The entire exchange took place between Edwards and Love. Thus, there is not sufficient evidence to support Brooks's conviction on this count.

### b.   Count Thirty--April 2008 Bribe from Morino

In Count Thirty, the Government alleges that Brooks and Edwards accepted a bribe from Morino in exchange for the release

of Calixte. As discussed above, Querrard testified that Edwards

and Brooks had been employed as police officers for decades.

Morino also testified that Edwards and Brooks informed him

that he would need to pay $1,000 to prevent Calixte from being

held in jail overnight. He further testified that he gave

Edwards $500, per Brooks' instructions, for the release of

Calixte. *After* paying Edwards $500, Morino testified that

Edwards and Brooks obtained Calixte's release, and prevented

Calixte from being taken "downtown to the Territorial Court."

From this evidence, a rational jury could reasonably conclude

that Edwards and Brooks were public officials and that they

accepted a gratuity in exchange for an official act.

### c. Count Thirty-Seven--February 2009 Bribe from Lindquist

In Count Thirty-Seven, the Government alleges that Brooks

accepted a bribe from Lindquist in exchange for not arresting

him for possessing an unlicensed firearm in or about February

2009. As discussed above, Querrard testified that Brooks had

been employed as a police officer for decades.

The Government also presented Lindquist's testimony that

Brooks requested a cash payment in order to "work something out"

after Brooks found Lindquist in possession of an unlicensed

firearm. Lindquist also testified that he later gave Brooks

$2,000.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 54

From this evidence, a rational jury could reasonably conclude that Brooks was a public official and that he accepted a gratuity in exchange for an official act.

### d.  Count Forty-Four--Summer 2009 Bribe from Lindquist

In Count Forty-Four, the Government alleges that Edwards and Brooks accepted a bribe from Lindquist in the summer of 2009. As discussed above, Querrard testified that that Edwards and Brooks had been employed as police officers for decades.

Lindquist testified that Brooks demanded, through Edwards, $3,500. This purportedly was in compensation for a volume of cocaine given to Lindquist as well as Brooks's failure to arrest Lindquist for possession of an unlicensed firearm. Lindquist also testified that, over the course of several months, he paid $3,500 to Brooks. Lindquist further stated that Brooks never arrested him for unlawfully possessing a firearm.

As discussed above, there was evidence that Edwards exploited Lindquist's fear of arrest in order to make him pay $3,500 for drugs. Although Lindquist only paid Brooks, Edwards solicited that payment on Brooks's behalf. Thus, there is sufficient evidence for a rational jury to conclude that Edwards accepted a bribe from Lindquist in the summer of 2009.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 55

Similarly, from this evidence, a rational jury could reasonably conclude that Brooks was a public official and that he accepted a gratuity in exchange for an official act.

### 8. Counts Twelve, Thirty-One, Thirty-Eight, and Forty-Five--Conflict of Interest

In Counts Twelve, Thirty-One, and Forty-Five, the jury found Edwards and Brooks guilty of conflict of interest, in violation of Title Three, Section 1102(3) of the Virgin Islands Code ("section 1102(3)"). In Count Thirty-Eight, the jury found Brooks guilty of conflict of interest, in violation of section 1102(3). To sustain its burden of proof on this charge, the government must show: (1) that the defendant knowingly had an interest in a transaction; and (2) that the transaction was in substantial conflict with the discharge of his official duties and his responsibilities as prescribed in the laws of the Virgin Islands. *See* V.I. CODE ANN. tit. 3, § 1102(3) ("[No territorial officer shall] have any interest, financial or otherwise, direct or indirect, or engaged in any business or transaction or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his duties in the public interest and of his responsibilities as prescribed in the laws of the Virgin Islands.")

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 56

### a.  Count Twelve--June 2007 (Love)

In Count Twelve, the Government alleges that Edwards and Brooks had a conflict of interest after receiving money from Love for the return of his car. As recounted above, Love testified that he paid money to Brooks and Edwards personally in exchange for the two officers returning his vehicle to him.

As discussed above, Love's testimony was not sufficient for a jury to conclude that Edwards actually took any portion of the money Love paid to have his truck returned. Love saw the tow-truck driver with some money and later received a receipt from the towing company for the full amount. A rational jury could not conclude from this evidence that Edwards knowingly had an interest in the transaction which was in substantial conflict with her official duties as police officers.

Similarly, no rational jury could infer that Brooks had a conflict of interest. There is no evidence that Brooks received any portion of the money Love paid. Thus there is not sufficient evidence to support Brooks's conviction on this count.

### b.  Count Thirty-One--April 2008 (Morino)

In Count Thirty-One the Government alleges that Edwards and Brooks had a conflict of interest after receiving a cash payment from Morino. As discussed above, Morino testified that he payed Edwards and Brooks money to secure the release of Calixte. Morino's testified that Edwards and Brooks derived a direct

monetary gain, in the form of Morino's payment, by reason of their position as VIPD officers. From this, a rational jury could reasonably conclude that Edwards and Brooks knowingly had an interest in the transaction which was in substantial conflict with their official duties as police officers.

### c. Count Thirty-Eight--February 2009 (Lindquist)

In Count Thirty-Eight, the Government alleges that Brooks had a conflict of interest in or about February of 2009 after receiving a cash payment from Lindquist in exchange for not arresting Lindquist. As discussed above, Lindquist testified that he paid Brooks money in order to prevent Brooks from arresting him for possessing an unlicensed firearm. Lindquist further testified that Brooks derived a direct monetary gain, in the form of Lindquist's payment, by reason of his position as a VIPD officer. From this, a rational jury could reasonably conclude that Brooks knowingly had an interest in the transaction which was in substantial conflict with his official duties as a police officer.

### d. Count Forty-Five--Summer 2009 (Lindquist)

In Count Forty-Five, the Government alleges that Edwards and Brooks had a conflict of interest after forcing Lindquist to pay for drugs in exchange for not being arrested. As discussed above, Lindquist testified that he paid Brooks money to prevent

Brooks from arresting him and in exchange for a quantity of

cocaine base.

As discussed above, there was evidence that Edwards

solicited money in exchange for not arresting Lindquist.

Although Lindquist did not testify to Edwards receiving any

direct monetary benefit, her solicitation of the payment is a

sufficient basis for a jury to conclude that she had an interest

in the transaction that ran counter to her official duties.

Similarly, Lindquist testified that Brooks derived a direct

monetary gain, in the form of Lindquist's payment, by reason of

his position as a VIPD officer. From this, a rational jury could

reasonably conclude that Brooks knowingly had an interest in the

transaction which was in substantial conflict with his official

duties as a police officer.

### 9. Count Twenty-Seven--Kidnapping

In Count Twenty-Seven, the jury found John-Baptiste guilty

of kidnapping, in violation of Title Fifteen, Section 1051 of

the Virgin Islands Code. To sustain its burden of proof on this

charge, the government must show: (1) that the defendant

unlawfully took or carried away an individual for a substantial

distance; (2) that the defendant had the intent to cause that

person to be confined or imprisoned in this Territory; and (3)

that the defendant took or carried away the individual against

that person's will. *See* V.I. CODE ANN. tit. 15, § 1051 ("Whoever .

. . . confines or inveigles or kidnaps another person, with intent
to cause him to be confined or imprisoned in this Territory
against his will, or to cause him to be sent out of this
Territory against his will . . . is guilty of kidnapping).

As discussed above, Calixte testified that John-Baptiste
slapped and choked her, and ordered her into his police car.
(Tr. Day 3 at 271:1-277:6.) She testified that he then took her
from the Red Hook area of St. Thomas to the Four Winds area of
St. Thomas. (Tr. Day 3 at 279:22-280:5.) Calixte also testified
that John-Baptiste then placed her in a holding cell at a police
station in the Four Winds area for approximately four or five
hours. (Tr. Day 3 at 280:3-281:15.) She further testified that,
while she did not strike John-Baptiste, she objected to his
taking her from her cab in the Red Hook area. (Tr. Day 3 at
277:7-14.)

This testimony, considered in the light most favorable to
the government, permitted the jury to conclude that John-
Baptiste unlawfully took or carried away Calixte for a
substantial distance, from Red Hook to Four Winds; that John-
Baptiste intended to confine Calixte; and that John-Baptiste's
actions were against Calixte's will. As such, sufficient
evidence existed for the jury to find John-Baptiste guilty of
kidnapping.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 60

## 10. Count Thirty-Five--Third-Degree Robbery

In Count Thirty-Five, the jury found Brooks guilty of third degree robbery, in violation of Title Fourteen, Sections 1861 and 1864 of the Virgin Islands Code. To sustain its burden of proof on this charge, the government must show: (1) that the defendant unlawfully took personal property with the specific intent to permanently deprive the owner of it; (2) that the personal property was in the possession of another, or was taken from the other's person or immediate presence; and (3) that the defendant accomplished the unlawful taking against the person's will by means of force or by putting the person in fear. *See* V.I. CODE ANN. tit. 14, §§ 1861 ("Robbery is the unlawful taking of personal property in the possession of another, from his person or immediate presence and against his will, by means of force or fear.").

Here, Lindquist stated that he paid money to Brooks under the threat of Brooks arresting him if he failed to make the payments. This is the same conduct that forms the basis of Brooks's alleged participation in a Hobbs Act conspiracy to extort, commission of Hobbs Act extortion, and commission of extortion under Virgin Islands law. Some courts have found that the same conduct may amount to both extortion and robbery. *See, e.g.*, *United States v. Smith* 320 F.3d 647, 657 (6th Cir. 2003) (noting that the defendant, Crisp, was convicted of both armed

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 61

bank extortion and bank robbery with forced accompaniment, after
explaining "Crisp's conduct was not limited to threats of future
violence typical of most extortions . . . . From the outset, the
conspiracy was directed at accomplishing one overarching
objective--a bank robbery. The events that Crisp characterizes
as indicative of extortion--invading branch managers' homes,
threatening their family members, and promising the release of
their husbands in return for money--were merely intermediate
steps toward completing the ultimate goal of robbing a bank.");
*United States v. Jackson*, 8 M.J. 511, 512 (C.A.A.F. 1979)
(holding that extortion was a lesser included offense of robbery
under the Uniform Code of Military Justice, reasoning that "an
integral part of a robbery by putting in fear . . . necessarily
includes an intention to take something of value under threat.
The robbery goes further and requires the actual taking, while
the extortion is completed with the threat. The completion of
the act of taking does not, however, alter the fact of existence
of the intent.").

However, the Court of Appeals for the Third Circuit has
held that Section 1861, Title 14 of the Virgin Islands Code
("Section 1861") incorporates the common-law elements of
robbery. *See Government of the Virgin Islands v. Carmona*, 422
F.2d 95, 98 (3d Cir. 1970) (finding that the statute requires
the defendant have the specific intent to permanently deprive

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 62

the victim of property). At common law, robbery is "the

felonious and forcible taking from the person of another of

goods or money [of] any value by violence or putting [that

person] in fear." *United States v. Nedley*, 255 F.3d 350 (3d Cir.

1958) (quoting 4 BLACK'S COMMENTARIES 241) (internal quotation marks

omitted). Most states and courts view robbery as involving

"immediate danger to the [victim]." *United States v.*

*Santiesteban-Hernandez*, 469 F.3d 376, 380 (5th Cir. 2006)

(quoting 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 20.3 intro.,

(d)(2) (2d ed. 2003)) (internal quotation marks omitted). "The

immediate danger element is what makes robbery deserving of

greater punishment than that provided for larceny and

extortion." Most states, as the Virgin Islands, incorporate the

immediate danger element by requiring that the property be taken

from a person or a person's presence by means of force or

putting in fear. *See, e.g.*, ALA. CODE § 13A-8-43(a); ARK. CODE ANN.

§ 5-12-102(a); CONN. GEN. STAT. ANN. § 53a-133; DEL. CODE ANN. tit.

11, § 831(a); D.C. CODE § 22-2801; GA. CODE ANN. § 16-8-40(a); 720

ILL. COMP. STAT. ANN. 5/18-1(a); IND. CODE ANN. § 711.1; KY. REV. STAT.

ANN. § 515.030; LA. REV. STAT. ANN. § 14:65(A); MD. CODE ANN. § 3-

401(e); MASS. GEN. LAWS ANN. ch. 265, § 19(b); MISS. CODE ANN. § 97-3-

73; N.H. REV. STAT. ANN. § 636:1(I); N.C. GEN. STAT. ANN. § 14-87.1;

N.Y. PENAL CODE § 160.00; OKLA. STAT. ANN. tit. 21, § 791; R.I. GEN.

LAWS § 11-39-1(b); S.C. CODE ANN. § 16-11-325; *see also*

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 63

*Santiesteban*, 469 F.3d at 380-82 (discussing implementation of

immediate danger element); 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW

§ 20.3 (2d ed. 2003).[2]

Here, Lindquist's testimony permitted the jury to find that

Brooks unlawfully took property from Lindquist with the

intention of permanently depriving him of it, and that Brooks

did so by way of threat. However, Brooks did not threaten

Lindquist with any immediate harm. The only threat was an

implied one that Lindquist might be arrested at some point if he

failed to pay as promised. Although such a threat is a

sufficient basis for extortion, it does not rise to the level of

immediacy required for robbery. The fact that conduct

constituting robbery may also constitute extortion does not

entail the converse. Conduct constituting extortion does not

necessarily constitute robbery. Accordingly, there was not

sufficient evidence for a rational jury to find that Brooks

committed third degree robbery.

### 11. Counts Fifty-Three and Fifty-Four--Structuring Transactions

In Counts Fifty-Three and Fifty-Four, the jury found

Edwards guilty of structuring transactions to evade reporting

requirements, in violation of 31 U.S.C. § 5324(a)(3). To sustain

---

[2] One notable exception, however, is the California Penal Code, which does not require an immediate threat of harm. *See United States v. Becerril-Lopez*, 541 F.3d 881, 892 (9th Cir. 2008) (analogizing robbery under the California Penal Code to "generic extortion [which] contains no requirement that the threat be of immediate harm . . . .").

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 64

its burden of proof on this charge, the government must show:

(1) that the defendant knew of the relevant reporting

requirements; and (2) that defendant structured her transaction

for the purpose of evading those reporting requirements. *See* 31

U.S.C. § 5324(a) ("No person shall, for the purpose of evading

the reporting requirements . . . (3) structure . . . any

transaction with one or more domestic financial institutions.").

    The Treasury Regulations describe what constitutes

structuring:

> [A] person structures a transaction if that
> person . . . conducts or attempts to conduct one or
> more transactions in currency, in any amount, at one
> or more financial institutions, on one or more days,
> in any manner, for the purpose of evading the
> reporting requirements . . . of this chapter. "In any
> manner" includes, but is not limited to, the breaking
> down of a single sum of currency exceeding $10,000
> into smaller sums, including sums at or below $10,000,
> or the conduct of a transaction, or series of currency
> transactions at or below $10,000. The transactions
> need not exceed the $10,000 reporting threshold at any
> single financial institution on any single day in
> order to constitute structuring within the meaning of
> this definition.

31 C.F.R. 1010.100(xx).

    In *United States v. Van Allen*, 524 F.3d 814 (7th Cir.

2008), Melvin Van Allen ("Van Allen") was convicted of twenty-

four counts of illegally structuring transactions to avoid

reporting requirements. Each of these counts "detailed a group

of cash deposits totaling over $10,000 with no single deposit

exceeding $10,000 all occurring on a single day. For example, in

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 65

Count Twenty-Four, Van Allen was charged with making four
separate cash deposits totaling $25,795, each under $10,000, at
three separate bank branches." *Id.* at 820. The Court of Appeals
for the Seventh Circuit held that the evidence supported Van
Allen's conviction, because it showed that "Van Allen withdrew
and deposited massive sums of money, all under $10,000" without
ever reporting it. *Id.*

The Seventh Circuit rejected Van Allen's argument that the
Government had failed to uphold its burden by not showing that
Van Allen actually had a "cash hoard" or single sum of money in
excess of $10,000 which he then broke up into smaller amounts.
*Id.* The Seventh Circuit defined structuring as "altering the
form of a transaction in order to avoid activating the bank's
duty to file a currency transaction report." *Id.* at 821
(internal citation and quotation marks omitted). Thus, the court
held, it was not necessary for the Government to show that the
defendant at any one time possessed a "cash hoard" in excess of
$10,000 so long as there was other evidence the form of the
transaction was altered. *Id.*

Here, Hugh Brown ("Brown"), an employee at the Bank of Nova
Scotia ("BNS"), testified that BNS prepares currency transaction
reports ("CTR") for any cash transaction which exceeds
$10,000.01. Another BNS employee, Danita Johnson-Harris
("Johnson-Harris") testified that on August 30, 2002, she filled

out a CTR, and explained the CTR process, when Edwards cashed a

$28,500 check. (Tr. Day 5 at 62:25-64:11.) The government also

offered the testimony of Erica Charles ("Charles"), an employee

at FirstBank, that on May 1, 2008, Edwards deposited $9,000 in a

bank account belonging to her. (Tr. Day 5 at 87:2-3; Gov't's Ex.

30d-1.) Charles further testified that Edwards deposited another

$9,000 into the same account the following day. (Tr. Day 5 at

89:21-23.) The government further offered the testimony of

Jeinicia Audain-Stephens ("Stephens"), an employee at FirstBank,

that on July 21, 2009, Edwards cashed a check for $9,900. (Tr.

Day 5 at 102:1-10.) Stephens further testified that on July 22,

2009, Edwards cashed a check for $9,500. (Tr. Day 5 at 100:23-

101:8.)

From this testimony, a rational jury could have concluded

that Edwards was aware of the $10,000 reporting requirement, and

structured her transaction on consecutive days, ranging from

$9,000 to $9,900, to avoid the $10,000 threshold.

**B.    Rule 33**

The defendants assert various errors that they argue should

result in a new trial, pursuant to Federal Rule of Criminal

Procedure 33.

**1.    Conflicting Testimony of Morino**

Brooks argues that conflicting testimony by Morino should

result in a new trial. Brooks argues that Morino's testimony was

incredible because Morino was unclear about whether he paid $500 to Brooks or Edwards. However, "in general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *United States v. David*, 222 Fed. App'x 210, 216 (3d Cir. 2007) (citations omitted). As the only issue that Brooks raises with respect to this testimony is that Morino contradicted himself, Brooks has not met his burden to merit a new trial.

### 2.    Prejudicial Effects of "Spillover Evidence"

Brooks further asserts that he suffered prejudice by the admission of evidence in support of Counts Thirteen through Twenty-One and Counts Forty-Eight through Fifty-One. Counts Thirteen through Twenty-One concern the alleged extortion of Elias Deeb. Counts Forty-Eight through Fifty-One concern an alleged "shakedown" of an individual known as Troy Willocks during which Brooks pocketed a quantity of marijuana. Brooks was acquitted of these Counts after the close of the Government's case by the Court pursuant to Federal Rule of Criminal Procedure 29.

The conduct alleged in these Counts was also alleged to be part of the pattern of racketeering activity alleged in Count One. Brooks now argues that the evidence adduced in support of Counts Thirteen through Twenty-One and Forty-Eight through Fifty-One had a prejudicial "spillover effect" and that the

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 68

Court erred by not explicitly instructing the jury to disregard this evidence in considering whether Brooks was guilty of the RICO Conspiracy charged in Count One.

"A 'pattern of racketeering activity' requires commission of at least two predicate offenses . . . ." *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990) (citing 18 U.S.C. § 1961(1), (5)). "[A] jury is presumed to act rationally, and a rational jury would convict a defendant of racketeering if all the elements of the crime, one of which is that the defendant have [*sic*] committed at least two predicate offenses, were proved." *United States v. Holzer*, 840 F.2d 1343, 1350 (7th Cir. 1988). Thus, assuming all the other elements of the offense have been satisfied, "even if [the jury] had exonerated [the defendant] of all the predicate offenses charged except [two] . . ., it would have had to convict [the defendant] of racketeering." *Id.* at 1351.

In *United States v. Holzer*, 804 F.2d 1343 (7th Cir. 1988), the defendant moved for a new trial after being convicted of a RICO Conspiracy because he was acquitted of some of the predicate acts at trial. *Id.* at 1350. The district court did not give the jury any instruction regarding whether it should disregard the predicate acts for which Holzer was acquitted in determining whether Holzer was guilty of the RICO Conspiracy. *Id.* Holzer argued that the jury may have used one or more of the

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 69

offenses of which he was acquitted as predicate acts. *Id.*

However, the Court of Appeals for the Seventh Circuit explained

that "Nothing in the RICO statute gives, and nothing in the jury

instructions gave, the jury any discretion to pick and choose

among predicate offenses." *Id.* at 1351. The Seventh Circuit

further elaborated that

> No rule of evidence is violated by the admission of
> evidence concerning a crime of which the defendant is
> acquitted, provided the crime was properly joined to
> the crime for which he was convicted and the crimes
> did not have to be severed for purposes of trial. It
> makes no difference, moreover, whether the jury
> acquits on some counts or the trial . . . court sets
> aside the conviction.

*Id.* at 1349.

Here, as set forth in detail above, even in the absence of

the counts of which Brooks was acquitted, the jury had ample

evidence to reasonably conclude that Brooks was guilty of a RICO

Conspiracy. Nothing in the jury instructions suggests that the

jury ought to consider the predicate acts alleged in Counts

Thirteen through Twenty-One or Forty-Eight through Fifty-One as

the basis for finding Brooks guilty on Count One. The Court will

presume that the jury followed the Court's instructions when

making its findings about the predicate acts Brooks had

committed. Brooks has not alleged or shown any evidence that the

jury behaved irrationally with respect to Count One.

Accordingly, there is insufficient evidence to warrant a new

trial because of any improper spillover effect.

### 3. Character Evidence

John-Baptiste argues that the Court wrongfully excluded evidence of Calixte or Morino's character under Federal Rules of Evidence 608 and 403. John-Baptiste wished to introduce testimony from two individuals, Ernest Bason ("Bason") and Michael Fitzsimmons ("Fitzsimmons"), who would each testify that Calixte or Morino were "liar[s] and [] person[s] unworthy of belief." John-Baptiste Mot. for J. of Acquittal 21.

Federal Rule of Evidence 404(a) provides, in pertinent part,

> Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.
>
> . . . .
>
>     (2) . . . . The following exception[] appl[ies] in a criminal case:
>
> . . . .
>
>         (B) . . . a defendant may offer evidence of an alleged victim's pertinent trait . . . .

Fed. R. Evid. 404(a). The existence of such a character trait may be proven "by testimony as to reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). Evidence of specific instances of conduct is ordinarily not admissible, Fed. R. Evid. 404(b), except where it is "an essential element of a

charge, claim, or defense," Fed. R. Evid. 405(b).

"A witness who wishes to testify about someone's reputation within a community must demonstrate that he or she knows of the person and is truly familiar with the 'community' in which the reputation has been formed, and that the basis of the reputation is one that is truly reliable." *Blackburn v. UPS, Inc.*, 179 F.3d 81, 101 (3d Cir. 1999). *See also Michelson v. United States*, 335 U.S. 469, 478 (1984) ("[T]he witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded."). When reputation evidence "is based on nothing more than rumors of unknown origins, or a single instance of 'someone told me so' a proper foundation has not been laid for admitting such evidence . . . ." *Id.*

Here, the asserted basis for the proffered character witness's testimony was a single prior legal dispute with Calixte and Morino. Neither of the witnesses indicated any other basis of knowledge of Calixte's and Morino's reputations. They did not indicate or intimate that they were acquainted with Calixte and Morino aside from their prior legal dispute, nor that they were familiar with the community and circles in which Calixte and Morino have moved. Indeed, Bason explicitly stated that he was not familiar with Calixte's reputation for honesty.

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 72

Tr. Day 5, p. 275. Thus, John-Baptiste failed to lay a

sufficient foundation to allow for the testimony of Bason or

Fitzsimmons. Accordingly, a new trial is not warranted on the

basis of the Court's exclusion of this evidence.

### 4. Hearsay Evidence

John-Baptiste argues that he should have been permitted to

offer testimony from the Virgin Islands Port Authority Police

Chief Edred Wilkes ("Chief Wilkes"). Chief Wilkes would have

testified that, during the days following Calixte's encounter

with John-Baptiste, Calixte never registered a formal complaint

about any sexual assault, and only complained of the physical

force he use to subdue her.

John-Baptiste first argues that Calixte's out-of-court

statements to Chief Wilkes were not hearsay, as John-Baptiste

was not offering them for the truth of the matter asserted.

" 'Hearsay' is a statement, other than one made by the declarant

while testifying at the trial . . ., offered in evidence to

prove the truth of the matter asserted." Fed. R. Evid. 801(c).

Hearsay is inadmissible unless it falls under one of the

exemptions or exceptions enumerated by the Federal Rules of

Evidence. Fed. R. Evid. 802.

John-Baptiste next argues that the statements are relevant

not because of their content, but rather to show that Calixte

had not previously complained of some of the conduct with which

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 73

John-Baptiste is now charged. To be relevant, evidence must relate to a "fact that is of consequence in determining the action." Fed. R. Evid. 401(b). "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury . . . ." Fed. R. Evid. 403. Here, the fact that Calixte may not have previously complained of John-Baptiste's unlawful conduct is not relevant to John-Baptiste's guilt. The criminal offenses at issue--kidnapping and third-degree robbery--do not require the victim to make any complaint; nor is there an affirmative defense available to John-Baptiste that would involve such a fact. Further, even if Calixte's previous complaint about John-Baptiste's conduct was minimally relevant, it is surely outweighed by the danger of unfair prejudice and confusion of the issues. Admission of such evidence could confuse the issues before the jury and might mislead the jury into believing that the relevant statutes required the victim to register a formal complaint. Given the low probative value of such evidence and the serious danger of confusion, the exclusion of Wilkes's testimony under Rules 401 and 403 does not merit a new trial.

Alternatively, John-Baptiste argues that Chief Wilkes's statement is admissible to impeach Calixte's credibility. Federal Rule of Evidence 801 provides that a witness's prior

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 74

statement that is "inconsistent with the [witness's] testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition," is not hearsay and is admissible as substantive evidence. Fed. R. Evid. 801(d)(1)(A).

Extrinsic evidence of a prior inconsistent statement may be admitted to impeach a witness's credibility under Federal Rule of Evidence 613(b). This "rule applies when two statements, one made at trial and one made previously, are irreconcilably at odds." *United States v. Askew*, 201 Fed. App'x 858, 860 (3d Cir. 2006) (quoting *United States v. Meserve*, 271 F.3d 314, 320 (1st Cir. 2001) (quoting *United States v. Winchenbach*, 187 F.3d 548, 558 (1st Cir. 1999))).

Here, the statements John-Baptiste sought to introduce were all made to police officers or officers of the Virgin Islands Port Authority, and were not made under oath. As such, they are not admissible as non-hearsay under Rule 801(d)(1)(A). Moreover, in her testimony, Calixte admitted that she did not report John-Baptiste's sexual assault to the police at first because she felt ashamed. Tr. Day 3, p. 317. However, she did complain about the force John-Baptiste used to subdue her. At no point did she ever affirmatively deny that she was sexually assaulte. Thus, her prior statements to the police and the Port Authority are not "irreconcilably contradictory." Accordingly, the exclusion

*United States v. Edwards*
Criminal No. 2010-36
Order
Page 75

of Calixte's prior statements does not warrant a new trial.


S_____
        **Curtis V. Gómez**
        **Chief Judge**